EDNA B. ELLEFSON, Appellee, v. HAWKEYE COMMERCIAL MEN'S
ASSOCIATION, Appellant.

**INSURANCE:** Accident Insurance—**Voluntary Exposure to Obvious**
1 **Danger.** An insured may be guilty of negligence in going upon the
platform of an electrical transformer, yet not guilty of a "volun-
tary exposure to obvious danger," within the meaning of a policy
of insurance against accident, when it appears that said act was
attended with no danger whatever unless the party took hold of
two wires at the same instant of time.

**INSURANCE:** Accident Insurance—**Change of Business.** An insured
2 under a policy of insurance against accident does not "change his
business or avocation," within the meaning of the policy, because
he, in addition to his business of cashier of a bank, acted as secre-
tary and treasurer of an electric light company, and on one occa-
sion, for an unknown reason, went upon the platform of an elec-
trical transformer and was killed.

*Appeal from Clay District Court.*—N. J. LEE, Judge.

MAY 13, 1924.

REHEARING DENIED SEPTEMBER 20, 1924.

ACTION in equity by plaintiff, who is the widow and bene-
ficiary in an accident certificate issued by defendant, a mutual
accident insurance association, asking that defendant be re-
quired to levy assessments to cover the loss, and for judgment.
The trial court found for the plaintiff. Defendant appeals.—
*Affirmed.* ·

*F. E. Northup, Robert E. Johnson,* and *J. W. Cory & Son,*
for appellant.

*Heald, Cook & Heald,* for appellee.

PRESTON, J.—By the certificate issued April 30, 1919, Deit-
rich R. Ellefson, deceased, became a member of the association,
entitled to benefits provided in its articles and by-laws. It is

alleged that, on July 28, 1921, insured met his death, by accidentally coming in contact with an electric wire charged with 6,600 volts of electricity. It is conceded that deceased was engaged in business at Gillett Grove, Clay County, Iowa, as the cashier of a bank, and continued to hold that position until the time of his death. But two questions, largely of fact, are presented. We reach the conclusion that, under the record, the trial court rightly found for plaintiff. A brief summary of the facts will suffice.

1. INSURANCE: accident insurance: voluntary exposure to obvious danger.

1.  The by-laws, which are made a part of the contract, provide that the association shall not be liable "for any indemnity for accidental death resulting from any of the following causes, * * * nor voluntary exposure to obvious danger * * * each of the foregoing causes are expressly exempted from the provisions of the by-laws granting to members or beneficiaries, benefits or indemnities."

Defendant avers that decedent came to his death by reason of a voluntary exposure to obvious danger, and that, therefore, it is not liable.

Deceased was also secretary and treasurer of the light and power company, an organization of farmers and others, owning an electric transmission line from Spencer to Gillett Grove. The company purchased its current from the plant at Spencer, and vended it to its stockholders. It maintained at Gillett Grove, a transformer outfit, designed to reduce the current from 6,600 volts on the high line to a voltage suitable for domestic purposes. One of the photographs introduced in evidence is here appended.

Immediately below the three "cans" is a platform, nine or ten feet from the ground.

The transformer, we take it, from another photograph taken at another angle, was a short distance from the bank where deceased was employed. From another photograph it appears that, as a part of the platform, there is a plank back of or on

the other side from the cans. The platform was so constructed as that people could climb up on it, and it was intended that they should, for proper purposes. It does not appear from the record why deceased was on the platform at the time in question. He had been seen on the platform two or three times before. He had no tools, and was not doing any work at the time in question. A witness puts it that he was just looking around up there,—did not appear to be working at anything. A witness for defendant, who was a practical electrical engineer, testified:

"When you go on the platform, there is absolutely no danger of any kind or character unless a person touches two wires at the same time. You could go up there and touch any of these live wires with your hand, and stand on the platform, which is supported on the other post, and feel no shock, if you held one wire at a time. I told Mr. Ellefson that there was no danger if he didn't touch two wires at once, and that it would be perfectly safe up there, but he shouldn't touch two wires at once. This guy wire running from the post is bedded in the ground; and if, having his right hand on one of these live wires, he would make a misstep and overbalance and touch the other, it would electrocute him. That is the only danger up there. I told Mr. Ellefson there was no danger at all, whether the current was on or off, so long as he didn't touch both wires at once. * * * I wouldn't consider it at all dangerous for Mr. Ellefson, who had been up there before, to go up there and walk along on the west side of the platform and feel these wires."

There is other evidence to the same effect. What happened, as described by the witnesses, is this: One says he saw him standing there, shaking that wire, and it looked as though he was about to turn around and come down, and his left hand went out and took hold of one of these guy wires, "and then I realized he was getting electricity. He had the appearance of sort of losing his balance. I noticed him shaking the wire with his right hand, and sort of lose his balance and throw out his left hand and come in contact with the guy wire. Unless he lost his balance, I did not see him do anything to cause him to reach out and take hold of that wire. He fell off of the plat-

form to the ground, and he died shortly afterwards.   Both
hands were burned.''

Another says that, when deceased went up on the trans-
former, he said he would go down and see if he could tell what
was the matter with the light; and when he went up on the
transformer, he walked to the south side and took hold of the
south wire and gave it a little shake; then he turned and walked
to the north wire, and gave that a little shake.

''When he did that, nothing happened at all. Then he
took hold of the guy wire, like he was going to come down, and
that is when it shot him. The wire nearest the guy wire he took
hold of was two or three feet away.''

There is other evidence along this line, and as to the famil-
iarity of deceased with the premises and method of turning off
the electricity before going onto the platform, and that he had a
key which would enable him to do so. It was not done at the
time in question. There would have been no danger if the cur-
rent had been turned off before he went upon the platform.

We deem it unnecessary to go into the evidence in further
detail at this point. In argument, appellant refers to the things
which might have been done by the deceased, and which would
have made it safer for him to go on the platform, and says that,
when he wholly neglected to observe the precautions with which
he had become familiar, he came within the provisions of the
policy which rendered the company immune from liability, be-
cause he voluntarily exposed himself to obvious danger. But
it is not a question of negligence. We so said in *Rowe v. United
Com. Trav. Assn.*, 186 Iowa 454, 464, where the question of bur-
den of proof and other questions argued herein are discussed.
See, also, *Christensen v. National Trav. Ben. Assn.*, 196 Iowa
375; *Payne v. Fraternal Acc. Assn.*, 119 Iowa 342. The instant
case is readily distinguished from the case of *Rommel v. Na-
tional Trav. Ben. Assn.*, 183 Iowa 776, where the question is'
quite fully discussed. In that case, the insured had practically
no chance to do what he was attempting to do. The risk was
obvious, and the danger apparent and necessarily appreciated.
In the instant case, the danger was not so much in going on
the platform as in touching two wires. The touching of the guy

wire was accidental,—involuntary. We said, in the *Rowe* case, supra, that the act which brings him into danger may be voluntary, yet the exposure be involuntary. We are quite clear that, under the record, the certificate was not avoided by voluntary exposure, as claimed.

The foregoing is the point upon which appellant puts the most stress.

2. The by-laws further provide, substantially, that a change of business or vocation by a member shall not forfeit his right to membership, but that, if he shall enter one more hazardous than the one at date of admission engaged in, then the member shall forfeit all rights of membership thirty days after such change, unless he shall elect in writing to receive the benefits fixed for the said extra-hazardous occupation. The classifications were: Select, entitling one to the amount of benefits provided in the by-laws; preferred, a smaller percentage; ordinary, a still smaller; medium; and hazardous,—one tenth.

2. INSURANCE: accident insurance: change of business.

"A member changing his business or vocation shall forthwith notify the secretary in writing of such change, and unless such notice is received by the secretary within thirty days, the member shall forfeit his membership, and the member is to receive back only any assessment paid after the change."

Defendant alleges that, at the time of the death, deceased had taken on another occupation,—that of an electrician, which is classified as extra-hazardous, and not insurable in the defendant association; and that for that reason defendant is not indebted to the plaintiff in any amount. Deceased, as a bank cashier, was accepted under the classification of "select." It is contended by appellant that deceased, in his capacity as secretary and treasurer of the power company, was engaged in doing things incidental to the carrying on of the business; that he was not a skilled mechanic or electrician, but at the time of his death was pursuing such calling, to the extent of having climbed upon the transformer and being engaged in some work in connection with the high-power line. The evidence does not sustain this contention. As said, it does not appear why deceased was on the platform: he had no tools, and was doing no

work as an electrician.  There is testimony that there was no occasion for deceased or anybody else to go on the platform, except to put in fuses, or to investigate.  It is not shown that deceased was putting in fuses.  This was a simple matter, but it was necessary to turn off the current.  They could not be put in otherwise.  At one time prior to this, the engineer had instructed deceased how to put in fuses, so that an expert would not have to be sent down from Spencer in case the town was in darkness, or possibly during the daytime when they needed power. Deceased at one time said he could do that, but was told that nobody was allowed up there unless he was an electrician, and deceased said: ''Well, we have an electrician here that can do it.  We can get him.''  There is no evidence that deceased ever put in a fuse, which, as said, was a simple matter.  Only once is the fuse shown to have been changed, and then another party, Hockett, a blacksmith living at Gillett Grove, changed it. Hockett says that deceased asked him to change the fuse.

''You can't reach the fuses from the platform; there is a plank above.  Hoberg generally read the meters.  On one occasion, deceased read my meter at the shop; looked at the meter; put it down on a piece of paper.  That is all there is to reading meters.  The duties of deceased as secretary and treasurer did not involve reading the meters.  The key to the transformer was left at the bank of which deceased was cashier, so that, if anyone was called down there to look over the transformer and make an adjustment, or to throw the switch lever, he could get the key at the bank.  Don't know whether or not the key was in his care; never saw him have it.''

The power company was a small enterprise, having about thirty-eight customers.  As secretary and treasurer, deceased received no salary.  All deceased had to do was to keep the books. At the time of the accident, deceased was still cashier of the bank, as before.

The foregoing is practically all the evidence on the question of change of occupation.  We think it falls far short of change of occupation, within the meaning of the law or in the contemplation of the policy.  The judgment is—*Affirmed.*

ARTHUR, C. J., EVANS and FAVILLE, JJ., concur.